Filed 7/22/14

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHILDREN AND FAMILIES COMMISSION OF FRESNO COUNTY, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> EDMUND G. BROWN, JR., as Governor, etc., et al., <br><br> Defendants and Respondents. | F066233 <br><br> (Super. Ct. No. 11CECG01077) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County. Debra J. Kazanjian, Judge.

Law Offices of Richard M. Pearl and Richard M. Pearl; Baker Manock & Jensen, Kenneth J. Price, Robert D. Wilkinson, and Amanda M. Neal, for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Mark R. Beckington and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

Plaintiffs Children and Families Commission of Fresno County (Fresno Commission), Madera County Children and Families Commission (Madera Commission), First 5 Merced County (Merced Commission), First 5 Solano Children and

Families Commission (Solano Commission) and Kendra Rogers (collectively the Commissions), appeal from a postjudgment order denying their motion for attorney fees sought under the private attorney general doctrine. (Code Civ. Proc., § 1021.5)[1] We conclude section 1021.5 does not apply because, as the trial court correctly determined, the financial burden of this litigation was not out of proportion to the Commissions' pecuniary stakes in the proceedings. We therefore affirm the order denying attorney fees.

### FACTUAL AND PROCEDURAL BACKGROUND

In November 1998, California voters adopted Proposition 10, the California Children and Families First Act of 1998. (Prop. 10, § 5, adopted Nov. 3, 1998; Health & Saf. Code, § 130100, subd. (c); hereafter Prop 10 or the Act.) Prop 10 created a program to promote, support and improve "the early development of children from the prenatal stage to five years of age[,]" "through the establishment, institution, and coordination of appropriate standards, resources, and integrated and comprehensive programs emphasizing community awareness, education, nurturing, child care, social services, health care, and research." (Health & Saf. Code, § 130100.)

To pay for these programs, Prop 10 imposes a surtax on cigarettes and tobacco products, which is deposited into the California Children and Families Trust Fund (the Trust Fund) in the State Treasury. (Health & Saf. Code, § 130105, subd. (a); Rev. & Tax. Code, §§ 30131, 30131.2.) Prop 10 also established a new state commission, known as the California Children and Families Commission (the state commission), and authorized each county to establish a county children and families commission. (Health & Saf. Code, §§ 130110, 130140, subd. (a)(1)(A).) The state and county commissions administer the programs authorized by the Act. (Health & Saf. Code, § 130100, subd. (b).)

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2.

The Trust Fund moneys are allocated and appropriated as follows:  (1) 20 percent to separate accounts of the state commission; and (2) 80 percent to county commissions, which are deposited into local trust funds administered by each county commission. (Health & Saf. Code, § 130105, subd. (d).)  Moneys in the local trust funds are to be "expended only for the purposes authorized by this [A]ct and in accordance with the county strategic plan approved by each county commission."  (Health & Saf. Code, § 130105, subd. (d)(2)(A).)

Prop 10 provides that moneys raised pursuant to the cigarette and tobacco taxes "shall be appropriated and expended only for the purposes expressed in [the Act], and shall be used only to supplement existing levels of service and not to fund existing levels of service.  No moneys in the [] Trust Fund shall be used to supplant state or local General Fund money for any purpose."  (Rev. & Tax. Code, § 30131.4.)  The Act authorizes the Legislature to amend its provisions by a two-thirds vote of both houses and provides that all amendments "shall be to further the [A]ct and must be consistent with its purposes."  (Stats. 1998, Proposition 10, § 8.)

In March 2011, Assembly Bill No. 99 (AB 99) was approved by more than two-thirds of each house of the Legislature and signed by the Governor.  AB 99 was enacted because of California's "severe fiscal crisis, which has resulted in funding shortfalls for many services at the state and local levels.  Health and human services programs that serve children are among the most seriously affected by this lack of funding."  (Stats. 2011, ch. 4 (AB 99), § 1(a).)  The Legislature found that funding shortfalls had forced counties to eliminate essential health and human services to children that had been paid for with state funds, and while many county commissions maintained substantial balances in their Prop 10 trust funds, they were unable to use the money to make up the shortfall

3.

due to the Act's prohibition against supplanting existing service levels. (Stats. 2011, ch. 4 (AB 99), § 1(d).)[2]

To solve this problem, AB 99 authorized the transfer of a specified amount of funding from the state and county trust funds. AB 99 added three Health and Safety Code sections: (1) section 130156, which established the Children and Families Health and Human Services Fund (Human Services Fund) in the State Treasury which was to be used "upon appropriation by the Legislature, to provide health and human services, including, but not limited to, direct health care services, to children from birth through five years of age"; (2) section 130157, which directed that $50 million be transferred from the state commission's accounts to the Human Services Fund; and (3) section 130158, which directed that $950 million from the combined balances of all the county commissions' trust funds be transferred to the Human Services Fund. The Legislature asserted this transfer did not supplant existing levels of service because the services were no longer being funded and that requiring Prop 10 funds to be used in this manner would help counties achieve the Act's "overall objective of promoting, supporting, and optimizing early childhood development." (Stats. 2011, ch. 4 (AB 99), § 1(g).)

Each non-exempt county commission was supposed to remit 50 percent of its county commission funding for deposit into the Human Services Fund by June 30, 2012. (Health & Saf. Code, § 130158, subd. (c)(2).)[3] These remissions were not to cause any county commission's fund balance to fall below the amount the county commission received from the Trust Fund in the 2009-10 fiscal year. (Health & Saf. Code, § 130158, subd. (c)(3).) To the extent the total remitted by all county commissions exceeded

---

[2] According to the Governor's Budget Summary for fiscal year 2011-12, which the Commissions submitted as an exhibit in support of their petition, as of June 30, 2009, county commissions held more than $2 billion in reserves.

[3] County commissions that received less than $600,000 in Trust Fund revenues in the 2009-10 fiscal year were exempt from this requirement. (§ 130158, subd. (c)(1).)

$950 million, the excess was to have been proportionally returned to all contributing county commissions. (Health & Saf. Code, § 130158, subd. (c)(5).)

On April 5, 2011, the Fresno, Madera and Merced Commissions, as well as taxpayer Kendra Rogers, filed a petition for writ of mandate in Fresno County Superior Court, naming Governor Edmund G. Brown, Jr., California State Controller John Chiang, and California Director of Finance Ana J. Matosantos as defendants (collectively the state officials). The Commissions alleged the Legislature exceeded its authority in enacting AB 99, asserting the measure interfered with local control of commission funds, violated Prop 10's prohibition on using those funds to supplant existing services, and threatened to allow expenditures for services to all age groups, rather than children to age five and their families. The Commissions sought a writ of mandate prohibiting the state officials from implementing or complying with AB 99; they also asked for declaratory and injunctive relief, as well as attorney fees pursuant to section 1021.5.

Pursuant to a stipulation, the Solano Commission joined the initial three commissions in prosecuting the action. Six other county commissions filed similar suits throughout the state. All of these cases eventually were consolidated in Fresno County.

Governor Brown's initial budget proposal in January 2011 called for using $1 billion of the more than $2 billion held in the state and county commissions trust funds to fund Medi-Cal services for children through age five to allow continued funding of core programs providing early childhood health services, subject to voter approval. This approach changed in the May Revision to the 2011-12 budget which increased funding to the Health and Human Service Agency by $1 billion in light of the legal challenges brought against the state's use of Prop 10 funding for the Medi-Cal program. While the May Revision noted the state would continue to defend the legal challenges, the Administration elected to take a conservative approach and restore the General Fund costs. The 2011-12 budget the Governor signed on June 30, 2011 did not include the transfer of the Prop 10 funds for use by the Health and Human Services Agency.

5.

On November 21, 2011, after briefing by the parties and argument, the trial court issued its order on the petition. The issue before the court was whether AB 99 was a valid amendment to Prop 10, which turned on whether AB 99 furthered Prop 10's purposes. The court rejected the state officials' assertion that the undisputed purpose of Prop 10 was funding programs for preschool children, finding instead that Prop 10 was intended to "'emphasize local decision-making' and 'provide for greater local flexibility in designing delivery systems.'" The court determined the purposes of the two laws were conflicting: while Prop 10 "clearly requires" local experts and community representatives to decide how the 80% funds are to be spent, AB 99 "clearly divests" the county commissions of that authority and vests it in the Legislature. As the court explained, "[t]o claim that transferring decision-making from local communities to the state legislature is 'consistent with' Prop 10 is like asking the court to find that black means white."

The court also found that AB 99 violated Prop 10's prohibition against using Trust Fund money to supplant or replace funding for existing levels of services for young children, noting that AB 99 "essentially states that its intent is to transfer the funds out of the local commissions to get around that prohibition by allowing the state legislature to do what Prop 10 prevents the commissions from doing." As the court explained, "by claiming that the [L]egislature has prioritized ensuring that the target population '*continue* to receive basic health care services,' they are essentially acknowledging that the legislative intent is to use these funds to 'fund existing levels of service.'"

The court concluded that, based on the evidence before it, neither Health and Safety Code section 130157 nor section 13158 furthered Prop 10 or were consistent with its purposes, and therefore the amendments could be validly enacted only be a vote of the electorate. The court also found that Health and Safety Code section 130156 could not be severed from the rest of AB 99. Therefore, the court held that the entire bill was invalid and the Commissions were entitled to judgment on the peremptory writ.

6.

Following the ruling, the Commissions dismissed their remaining causes of action, with the exception of their attorney fees claim. The court entered final judgment on January 11, 2012. The state officials elected not to appeal the judgment.

The Commissions subsequently filed a motion for attorney fees under section 1021.5, which provides, in relevant part, "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (1) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

The motion sought $382,382.50 in attorney fees incurred during the litigation.[4] The Commissions argued their lawsuit enforced important rights affecting the public interest and conferred a significant benefit on two classes of persons: (1) children from the prenatal stage to age five and their families, and (2) California voters. They asserted the lawsuit benefitted more than just their own constituents, as it enforced the rights of all California voters and young children and families throughout the state. The Commissions claimed their interest in the litigation was not financial, as they sought to protect the funds entrusted to them and ensure the Trust Fund would be allocated to programs through local decision-making and not used to supplant funding for existing services for young children. While the Commissions acknowledged they would retain a substantial amount of money by virtue of the lawsuit, they argued this was not an

---

[4] The six other county commissions whose actions were consolidated with the Fresno action filed separate motions for attorney fees, in which they sought to recover a total of $314,176.05 in fees. Thus, all plaintiffs sought to recover a combined total of nearly $700,000 in fees.

7.

economic benefit to them but instead constituted money held in trust for the benefit of their constituents.

In their opposition to the motion, the state officials argued that the Commissions had not shown that the lawsuit conferred a substantial benefit on the general public or a large class of persons, as neither young children nor the California electorate received any meaningful benefit from the trial court's determination that AB 99 exceeded the Legislature's power to amend Prop 10. The state officials further argued the Commissions had not established that the financial burden of enforcement made an attorney fee award appropriate, as they had a sufficient financial interest to bring the lawsuit without the prospect of an attorney fee award and their litigation costs of $382,382.50 were not disproportionate to their expected financial gain, i.e. the retention of more than $30 million in trust money that was subject to transfer had AB 99 been enforced.

The trial court denied the motion for attorney fees. In its written order, it explained its decision as follows: "Here . . . the petitioner commissions are public entities with identified constituencies, appointed to hold and distribute the funds they receive in trust for their constituents. In this case, the Commissions obtained a significant pecuniary benefit for their constituencies from this litigation, and as argued in the opposition, it was in no way 'disproportionate' to the $700,000 in fees they claim to have incurred, since the funds they preserved for their constituents were in the hundreds of millions.

"The Commissions did not need the prospect of attorney's fees as an incentive to bring this litigation, and the issue they brought to the court was basically whose judgment was to decide the best way to help young California children; it was that of the local commissions set up by Prop 10 o[r] the state [L]egislature. While the court found, as it had to, that the [L]egislature was not authorized to make that determination based on the

8.

plain language of Prop 10, that doesn't necessarily mean that there was a net 'substantial benefit' to the families who receive Prop 10 services.

"While respondents concede that important rights were protected (including the right of the electorate to control the scope of legislative authority to amend statutes passed by initiative and the right of young children to the benefits of locally determined programs funded with taxpayer dollars), there is a question as to the extent of the 'substantial benefit' obtained in that the inability of the state to use the one billion of tobacco tax revenue to fund existing health related programs necessarily meant that there were less funds available to fund those programs.

"With regard to benefit to the electorate, it does seem, as respondents have argued, that the issue here wasn't whether the people have the right to set limits on the power of the [L]egislature to make amendments, but whether in this case AB 99 furthered the Act and was 'consistent with its purpose,' since the voters specifically authorized amendment on a 2/3 vote of the [L]egislature where those conditions were met.

"Additionally, to qualify for an award under CCP § 1021.5, the court must find that it would not be 'in the interest of justice' to pay the fees out of the plaintiff's recovery, 'if any.' Here, the Commissions were able to hold on to millions of dollars in funds they would otherwise have lost, out of which the $700,000 could be paid. On the other hand, the State lost access to the $1 billion it wanted to use to pay for critically needed health care services. If it now has to also pay $700,000 to the Commissions, that is even less available to fund health services. [¶] While petitioners have argued that denying the motion would result in a deprivation of services to young children, an equivalent deprivation may be suffered if the state w[ere] required to pay."

Only the Fresno, Madera, Merced and Solano commissions, along with Kendra Rogers, appealed the fee denial.

9.

## DISCUSSION

*Section 1021.5*

Section 1021.5 codifies the private attorney general doctrine enunciated in *Serrano v. Priest* (1977) 20 Cal.3d 25, which ""'"rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of fundamental public poli[c]ies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible."'"" (*Healdsburg Citizens for Sustainable Solutions v. City of Healdsburg* (2012) 206 Cal.App.4th 988, 992.) The doctrine's purpose "is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 390 (*Robinson*).)

As pertinent here, an award under section 1021.5 requires a showing that (1) the litigation enforced an important right affecting the public interest; (2) it conferred a significant benefit on the general public or a large class of persons; and (3) the necessity and financial burden of private enforcement, or enforcement by one public entity against another, were such as to make the award appropriate. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 (*Whitley*).) Since the statute states the criteria in the conjunctive, each element must be satisfied to justify a fee award. (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 429 (*Maywood*).) Accordingly, we may uphold the trial court's order denying the attorney fees motion if we determine any one of these elements is missing.

The third element, the necessity and financial burden requirement, involves two issues: ""'"whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys."'"" (*Whitley*, *supra*, 50 Cal.4th at pp. 1214-1215.) It is the second prong which is at issue here. Our Supreme Court has explained this prong as follows: "In determining the financial burden

on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. "'An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.'" [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) A party seeking fees under section 1021.5 has the burden of establishing its litigation costs transcend its personal interests. (*Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 246-247; *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 113.)

In *Whitley*, our Supreme Court clarified the proper method of evaluating the "financial burden" element of section 1021.5, i.e. when the cost of the legal victory transcends the successful party's personal interest. (See *Maywood*, *supra*, 208 Cal.App.4th at pp. 429-430.) As explained in *Maywood*, before *Whitley*, "appellate courts were divided as to whether it was proper to consider a claimant's nonpecuniary 'personal interests' when applying the financial burden element. [Citations.] *Whitley* resolved the dispute, holding that 'a litigant's personal nonpecuniary motives may not be used to disqualify [that] litigant from obtaining fees under section 1021.5.'" (*Maywood*, *supra*, 208 Cal.App.4th at p. 430.)

The plaintiff in *Whitley*, the conservator of her developmentally disabled brother, brought litigation resulting in a published appellate opinion that extended certain procedural protections to disabled persons challenging a community placement. (*Whitley*, *supra*, 50 Cal.4th at pp. 1211-1212.) The trial court denied her subsequent request for attorney fees under section 1021.5, in part, on the ground the financial burden imposed by the case was not out of proportion to her personal interest in her brother's well-being. (*Whitley*, *supra*, 50 Cal.4th p. 1213.) The Court of Appeal affirmed the fee

11.

denial, holding that a strong nonpecuniary personal interest in the litigation could disqualify a litigant from obtaining attorney fees under section 1021.5. (*Whitley*, *supra*, 50 Cal.4th at p. 1213.)

Our Supreme Court reversed, holding that "a litigant's personal nonpecuniary motives may not be used to disqualify that litigant from obtaining fees" under section 1021.5. (*Whitley*, *supra*, 50 Cal.4th at p. 1211.) The Court explained that the appellate court's contrary interpretation has no basis in the language, legislative history, or evident purpose of section 1021.5, which is "not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Whitley*, *supra*, 50 Cal.4th at p. 1211.)

In so holding, the Court cited, with approval, the method for weighing costs and benefits of litigation illustrated in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*LAPPL*). (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) First, the trial court fixes or estimates "'. . . the monetary value of the benefits obtained by the successful litigants themselves[,]'" discounted by "'some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome.'" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) Next, the trial court turns to the costs of the litigation which may have been required to bring the case to fruition. (*Id.* at pp. 1215-1216.) Finally, the trial court "'place[s] the estimated value of the case beside the actual cost and make[s] the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case. . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.'" (*Id.* at p. 1216, citing *LAPPL*, *supra*, 188 Cal.App.3d at pp. 9-10.)

Although *Whitley* was a private enforcement action, one appellate court has concluded that its holding applies to public enforcement cases where a public entity pursues attorney fees against another public entity. (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 432.) The court in *City of Maywood* noted that, "when applying section 1021.5's 'financial burden' criterion to political subdivisions, the trial court should consider whether the burden of the litigation transcended the interests of both the political entity and the collective interests of the individuals that entity represents." (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 435.) But, "when assessing this factor in the context of a public entity's legal victory, the trial court may only consider the public entity's pecuniary interests and the pecuniary interests of its constituents." (*Ibid.*)[5]

*Standard of Review*

Here, the trial court effectively determined that the Commissions failed to satisfy the financial burden element of section 1021.5 because the cost of the litigation was not out of proportion to the value of the case to the Commissions' constituents. Generally, a trial court's ruling on a request for attorney fees under section 1021.5 is reviewed for abuse of discretion. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 251.) De novo review is appropriate when the trial court's determination of whether the statutory criteria were met presents an issue of statutory construction or a question of law. (*Whitley*, *supra*, 50 Cal.4th at p. 1213; *Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1025-1026.)

The financial burden element of section 1021.5 requires a determination of the cost of the litigation relative to its value to the Commissions. This is not a question of

_____

[5] As noted in *City of Maywood*: "'Section 1021.5 originally precluded public entities from receiving fees under the statute. [Citation.] In 1993, however, the Legislature amended the statute to its present form, which allows a public entity to recover attorney fees from another public entity.'" (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 432, fn. 35.)

law.  The trial court, being more familiar with the dynamics of the litigation, is in a better position to assess the financial burden of the lawsuit in relation to its value to the Commissions.  We review the trial court's order for abuse of discretion.  (See *LAPPL*, *supra*, 188 Cal.App.3d at p. 11 [trial court's assessment of financial burden element merits deference from appellate court, though appellate court "need not shirk" from correcting errors in methodology or calculation].)

In reviewing the ruling, "'we must pay "'particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision.'"'" [Citation.]  'The pertinent question is whether the grounds given by the court . . . are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute.'" (*County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648.)  "The trial court's determination may not be disturbed on appeal absent a showing that there is no reasonable basis in the record for the award." (*Ibid.*)

*Analysis*

The trial court determined the Commissions brought this litigation to preserve their trust funds, which were to be used to pay for programs for their constituents.  It denied the Commissions' section 1021.5 fee request because the trust fund money they preserved far exceeded the fees incurred and therefore the bounty of a fee award was not required to encourage the litigation.

The trial court did not abuse its discretion in so finding.  The evidence before the court showed that the Commissions faced losing more than $31 million combined had the

14.

transfers provided for by AB 99 gone into effect.[6]  The amount saved was more than 80 times the amount of attorney fees expended – $382,382.50.  The Commissions did not need a bounty of court-awarded fees to encourage the litigation and the financial burden of the litigation was not out of proportion to the Commissions' stake in the matter.

The Commissions contend the trial court applied the incorrect standard when assessing whether the financial burden of enforcement by one public entity against the other makes a fee award appropriate.  Arguing that a different standard applies to public enforcement actions, they assert the pertinent question in such cases is whether the public entity deserves a reward for pursuing litigation that was in the interest of more than its own constituents, citing *People ex rel. Brown v. Tehama County Bd. Of Supervisors* (2007) 149 Cal.App.4th 422 (*Tehama County*).

In *Tehama County*, the Court of Appeal held that the People of the State of California, acting through the Attorney General, were not entitled to recover attorney fees under section 1021.5.  The court concluded this was because the financial burden criterion cannot apply to the Attorney General, as it is the Attorney General's job to pursue litigation that is in the general interest of the state's population and therefore the Attorney General needs no encouragement to pursue such litigation.  (*Tehama County*, *supra*, 149 Cal.App.4th at pp. 454-456.)  In so holding, the appellate court explained that historically, the traditional financial burden criterion of section 1021.5 "served to limit fee awards under the statute to persons who pursue public interest litigation at a cost to themselves that is out of proportion to any personal interests they might have in the outcome of the matter[,]" and "has always served 'as a "bounty" for pursuing public interest litigation, not a reward for litigants motivated by their own interests who

_____

[6] The Commissions estimated transfers were as follows: (1) $16,659,721 from Fresno; (2) $3,237,435 from Madera; (3) $3,136,168 from Merced; and (4) $8,819,307 from Solano.

15.

coincidentally serve the public." (*Tehama County*, *supra*, 149 Cal.App.4th at pp. 453, 454.) The court concluded the traditional financial burden criterion "can easily be applied to public entities that are political subdivisions of the state – that is, something less than the state as a whole," as "in such a case, the pertinent question is whether the public entity deserves a reward for pursuing litigation that was in the interest of a greater spectrum of the public than its own constituents." (*Tehama County*, *supra*, 149 Cal.App.4th at p. 456.)

*Tehama County* does not support the Commissions' assertion that a different standard applies to public entities seeking to recover attorney fees under section 1021.5. Instead, *Tehama County* shows that the historical financial burden criterion applies to public entities, i.e. that fee awards to public entities are limited to public entities who pursue public interest litigation at a cost to themselves that is out of proportion to any personal interest they might have in the outcome of the matter. (*Tehama County*, *supra*, 149 Cal.App.4th at p. 453.) As the Court of Appeal explained in *City of Maywood*, it is clear that after our Supreme Court's decision in *Whitley*, this inquiry requires consideration of only the pecuniary interests of the public entity and its constituents, and whether the burden of litigation transcends those interests. (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 435.)

The trial court here determined the burden of the litigation did not transcend the pecuniary interests of the Commissions and their constituents, as their pecuniary interests far outweighed the burden the litigation placed upon them. While this litigation also conferred pecuniary benefits on other county commissions and their constituents throughout the state, the Commissions and their constituents obtained a substantial pecuniary benefit for themselves. In bringing suit, the Commissions were protecting their sole source of funding without which they would not exist. The trial court reasonably could conclude that, in a situation where the Commissions stood to preserve for their constituents funds that greatly exceeded the attorney fees expended, they did not deserve

a reward for pursuing litigation that coincidentally conferred statewide benefits. While the Commissions urge us to look simply at the number of children who benefitted statewide in determining whether they satisfied the financial burden prong, they ignore that it is the pecuniary interests of the parties that is at issue, not simply the number of people who benefitted. (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 435.)

The Commissions next argue they did not have a quantifiable pecuniary interest that can be compared to the costs of litigation because they did not seek, and were not awarded, monetary relief. We are not persuaded. Although the Commissions were seeking equitable relief rather than money damages, the goal of the equitable relief was to retain their trust fund moneys so they could provide programs for their constituents. The benefit to be obtained from this litigation was pecuniary, namely the preservation of money, even if that pecuniary benefit did not come in the form of money damages. The Commissions assert that the state officials conceded below that the Commissions did not recover a net monetary judgment. The state officials made this statement when arguing that the Commissions were not prevailing parties for the purpose of recovering costs against the Controller. Such a statement does not amount to a concession that no pecuniary benefit was bestowed on the Commissions for purposes of determining an award of attorney fees under section 1021.5.

The case upon which the Commissions rely, *Samantha C. v. State Dept. of Developmental Services* (2012) 207 Cal.App.4th 71 (*Samantha C.*), does not compel a different result. There the plaintiff successfully sued the State Department of Developmental Services (DSS) and a regional center for declaratory relief and a petition for writ of mandate to overturn determinations that she did not have a developmental disability and therefore was not entitled to services under the Lanterman Developmental Disabilities Services Act (Lanterman Act). (*Samantha C.*, *supra*, 207 Cal.App.4th at pp. 73-74.) Her suit resulted in a published appellate opinion in which the Court of Appeal concluded she was eligible for services because she had a disabling condition within the

meaning of the Lanterman Act. (*Samantha C.*, *supra*, 207 Cal.App.4th at pp. 73-74.) The trial court subsequently denied her request for $243,817.50 in attorney fees under section 1021.5. (*Samantha C.*, *supra*, 207 Cal.App.4th at 77.) The Court of Appeal reversed, concluding that its prior opinion resulted in the enforcement of an important right affecting the public interest and conferred a significant benefit on the general public. (*Samantha C.*, *supra*, 207 Cal.App.4th at pp. 77-78.) The appellate court also found the necessity and burden of private enforcement made the award appropriate, as the necessity of pursuing the lawsuit placed a burden on Samantha out of proportion to her individual stake in the matter, and the attorney fees should not in the interest of justice be paid out of the recovery, which was nonexistent. (*Id.* at p. 81.)

Unlike *Samantha C.*, where the nearly $250,000 in attorney fees the plaintiff incurred was out of proportion to her individual stake in the litigation, i.e. the provision of regional center services, the burden of this lawsuit in the form of nearly $383,000 in attorney fees was not out of proportion to the Commissions' stake in this matter, namely the preservation of over $31 million in Prop 10 funds.

The Commissions argue the trial court improperly focused on their "initial subjective motivation" behind the lawsuit, citing *Whitley*, *supra*, 50 Cal.4th at p. 1219. We disagree. As we have explained, in *Whitley*, the Court held that a litigant's personal, nonpecuniary motives did not preclude an award of fees on the theory that having such a stake in the litigation offset the costs under the "financial burden" prong of section 1021.5. (*Whitley*, *supra*, 50 Cal.4th at p. 1211.) In this context, the Court rejected an argument that the litigant's reasons for bringing suit were controlling: "[T]he Legislature that enacted section 1021.5 was not so much concerned with what brought a litigant with a potential public interest case into an attorney's office, but rather with allowing that litigation to move forward from there by offering at least the prospect that the financial burden of the litigation could be shifted to the opposing party if the litigant prevailed." (*Whitley*, *supra*, 50 Cal.4th at p. 1220.)

18.

We do not construe the trial court's order as showing an improper focus on the Commissions' reasons for bringing the lawsuit. The trial court essentially found that the Commissions filed suit to protect the pecuniary interests of their constituents and did not need the prospect of attorney fees as an incentive to bring the litigation. This is not tantamount to a finding that the Commissions' subjective motivation for bringing suit itself warranted a denial of fees – rather, the court was rejecting the Commissions' claim that they lacked a pecuniary interest in the litigation.

The trial court's observation that the benefits retained far exceeded the Commissions' attorney fees shows that it was properly focused on the third element of section 1021.5 – whether the financial burden of the litigation was objectively disproportionate to the Commissions' stake in the case. "[A] court may speak of the litigant's motivation 'as a shorthand reference to the court's conclusion that the objective financial incentives for prosecuting the lawsuit were not disproportionate to the financial burden.' Motivation language is particularly useful because in assessing the financial burdens and benefits in the context of section 1021.5, we are evaluating incentives rather than outcomes." (*Whitley*, *supra*, 50 Cal.4th at p. 1220.)

The Commissions contend that, regardless of the dollar value of the services preserved, a fee award is appropriate because "they are non-profit government entities whose purpose was simply to be able to keep providing the services to their constituents that the electorate had funded them to provide." In so arguing, they compare this case to *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641 (*Blythe*), and *Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162 (*Aakhus*), in which attorney fees were awarded under section 1021.5 to health clinics that successfully obtained injunctions against anti-abortion protestors who blocked access to women in need of the clinics' services. The cases are distinguishable. In both, the fact that the clinics were advocating on behalf of the constitutional right to privacy was a key factor in the attorney fees analysis. (*Aakhus*, *supra*, 14 Cal.App.4th at pp. 172-173; *Blythe*, *supra*, 32

19.

Cal.App.4th at p. 1668.)  More importantly, neither clinic received a monetary recovery or sought to recover lost revenues; instead, they sued to allow women to have access to their clinics.  (*Aakhus*, *supra*, 14 Cal.App.4th at p. 173; *Blythe*, *supra*, 32 Cal.App.4th at p. 1668.)  In contrast here, the Commissions did not sue on behalf of their clients' constitutional rights and retained a substantial sum of money in their lawsuit.  (See *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1480 [noting that "the clinic in *Blythe* did not receive any monetary recovery in the action, whereas [plaintiff] obtained a judgment providing for the retention of $350 million by its members."].)

Finally, the Commissions argue the trial court should have disregarded their financial interest in bringing the action because the benefit their lawsuit conferred on the public was significant.  As the Court of Appeal explained in *LAPPL*, a fee award may be appropriate even where the expected value of the litigant's monetary award exceeds the actual litigation costs by a substantial margin:

"All these factors under section 1021.5 are interrelated, however.  Where the benefits achieved for others are very high it will be more important to encourage litigation which achieves those results.  Accordingly, it will be more important to offer the bounty of a court-awarded fee than where the public benefits are less significant.  Thus, the courts should be willing to authorize fees on a lesser showing of need than they might where the public benefits are less dramatic.  This means the court sometimes should award fees even in situations where the litigant's own expected benefits exceed its actual costs by a substantial margin.

"In contrast, where the public benefits are modest the courts should award fees only where the litigant's own expected benefits do not exceed its costs by very much (or possibly are even less than the costs of the litigation).  To put it another way, when the ratio between public benefits and the litigant's expected benefits is high the court should award fees even though the ratio between expected litigant benefits and litigant costs is

20.

high. On the other hand, where the ratio between public benefits and expected litigant benefits is relatively low so must be the ratio between the expected litigant benefits and litigant costs in order to justify a fee award." (*LAPPL*, *supra*, 188 Cal.App.3d at p. 10.)

The Commissions contend it is an "indisputable fact" that the public benefits of this lawsuit were "'very high,'" as they preserved $1 billion to fund services for young children throughout the state, as well as local control over those services, and enforced the voters' constitutional right to determine the proper use of the taxes imposed by Prop 10. But while the ratio of the public benefits – the $1 billion in county commission trust fund money saved – to the Commissions' benefits of approximately $31 million is high, the ratio of the Commissions' benefits to their litigation costs is significantly higher. Given that the benefit to the Commissions greatly exceeded the benefit to the other county commissions throughout the state, the trial court did not abuse its discretion in making the value judgment that a bounty of a court-awarded fee was not necessary to encourage litigation of this type.[7]

Because we conclude the trial court did not abuse its discretion in determining that the Commissions failed to meet the "financial burden" element of section 1021.5, we need not consider whether it satisfied the other criteria upon which the court denied the motion, i.e., whether it conferred a significant benefit on the general public or a large class of persons and whether attorney fees should not be paid out of the recovery in the interests of justice.

---

[7] For the first time in their reply brief, the Commissions argue that the trial court's interpretation of the term "appropriate" in section 1021.5 is belied by the construction given that term in federal fee-shifting statutes such as the Endangered Species Act (16 U.S.C. § 1540(g)(4) and Clean Water Act (33 U.S.C. § 1365(d)). They assert that the term should be given a broad meaning and, if it were, there was nothing inappropriate about awarding fees to them for serving the interests of the state at large. We summarily reject this contention because we will not address arguments raised for the first time in the reply brief. (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1295.)

## **DISPOSITION**

The order denying an award of attorney fees under section 1021.5 is affirmed.

Respondents shall recover their costs on appeal.

_____

Gomes, Acting P.J.

WE CONCUR:

_____

Kane, J.

_____

Peña, J.