Filed 11/3/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILLVIEW COUNTY WATER DISTRICT et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>STATE WATER RESOURCES CONTROL BOARD,<br><br>    Defendant and Appellant. | A145428<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVPT1259715)<br><br> ORDER MODIFYING OPINION<br><br> NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on September 28, 2016, be modified as follows:

On page 14, after the sixth sentence in the first full paragraph, the case citation is changed from "(*Whitley*, at pp. 1015–1016.)" to "(*Whitley*, at pp. 1215–1216.)."

There is no change in the judgment.

Dated:

_____

Margulies, Acting P.J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILLVIEW COUNTY WATER DISTRICT et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> STATE WATER RESOURCES CONTROL BOARD, <br><br>     Defendant and Appellant. | A145428 <br><br> (Mendocino County <br> Super. Ct. No. SCUKCVPT1259715) |

In 2001, Millview County Water District (Millview) began diverting substantial flows from the Russian River under a century-old water rights claim leased from Thomas Hill and Steven Gomes.  In 2009, Millview purchased the claim for $2.1 million, just four months after defendant State Water Resources Control Board (Board) issued a notice proposing entry of a cease and desist order (CDO) that would drastically restrict diversion under the claim.  After the Board entered the proposed CDO, Millview, Hill, and Gomes (plaintiffs) jointly prevailed in a mandate action filed to challenge the CDO. We affirmed the superior court's order vacating the CDO in *Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879 (*Millview I*).

Following our decision, plaintiffs sought an award of attorney fees from the Board under Code of Civil Procedure[1] section 1021.5, arguing they had conferred a substantial public benefit by obtaining a published appellate opinion addressing the issue of water

---

[1] All statutory references are to the Code of Civil Procedure.

rights forfeiture under California law.  Plaintiffs argued the action had constituted a "financial burden" to them, as the term is used in section 1021.5, because they stood to gain no money judgment from the action.  The trial court awarded plaintiffs attorney fees with respect to the appeal, although the court declined to award fees incurred during the remainder of the legal proceedings.  The Board challenges the award of appellate fees, while plaintiffs have appealed from the denial of fees regarding the rest of the litigation.  We vacate the award and affirm the trial court's decision not to award additional fees, concluding plaintiffs failed to provide evidence that the financial cost of the litigation outweighed its potential financial benefits to them.

## I.  BACKGROUND

California maintains a "dual system" of water rights, which distinguishes between the rights of "riparian" users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and "appropriators," those who hold the right to divert such water for use on noncontiguous lands.  (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 961.)  Riparian users and appropriators whose claims were staked before December 1914 need neither a permit nor other governmental authorization to exercise their water rights.  (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 428–429.)  While there is no predetermined limit on the amount of water an individual riparian user may divert (*Phelps v. Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 116, 118–119), appropriators may divert only so much water as is authorized by their particular water right, assuming the claim was properly perfected by the original claimant (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 776).

In 1998, Hill and Gomes acquired a 33.88-acre parcel of land adjoining the Russian River (the parcel).  As part of the transaction, they were assigned an appropriative water right known as the "Waldteufel claim," which had been recorded in early 1914 by J.A. Waldteufel, a prior owner of the parcel.  As later determined by the Board, Waldteufel claimed the right to divert the equivalent of 1,450 acre-feet per year (afa) from the Russian River.

3

In 2001, Hill and Gomes sold most of the parcel to a developer, who later constructed homes on it. The same year, they licensed the Waldteufel claim to Millview, which provides water service to an unincorporated area of Mendocino County north of Ukiah. The annual license fee started at $10,000 in 2001 and rose to $30,000 by 2005. Soon after licensing the Waldteufel claim, Millview began diverting water from the Russian River, supplying water not only to the homes built on the parcel but also elsewhere within the boundaries of the district. During the years for which information is available in the record, 2001 through 2008, Millview's diversions varied from a low of 3.76 acre-feet in the first year to a high of 1,174.75 acre-feet in 2005.

In 2006, a private citizen filed a complaint with the Board, contending the Waldteufel claim did not authorize Millview's diversion because the right was riparian rather than appropriative and forfeited by long nonuse. Board staff investigated the claim and, the next year, issued a memorandum concluding that water rights under the Waldteufel claim had indeed been largely forfeited. Staff opined the claim could now support the diversion of no more than 15 afa, dramatically less than the 1,450 afa claimed in Waldteufel's claim. In April 2009, the Board issued a notice proposing entry of a CDO limiting Millview's diversion of water under the Waldteufel claim to a maximum volume of 15 afa. Plaintiffs requested a hearing on the proposed CDO.

A few months later, in August 2009, Hill and Gomes sold the Waldteufel claim to Millview, along with two parcels of real property referred to as "the Riparian Corridor" and "Parcel A, together with any appurtenant water rights." The purchase price of $2,131,500 was not allocated separately among the assets.[2] The agreement embodying the sale (the purchase agreement) required Millview to make a down payment of $500,000, with the remainder of the purchase price funded by a promissory note due and payable three years from the close of escrow or "120 days following the time a final order

_____

[2] Plaintiffs consistently treat the purchase agreement and the consideration paid under it as covering only the Waldteufel claim, disregarding the transferred real property. We were unable to find in the appellate record any information about the nature of these parcels, although they are expressly included in the purchase agreement.

4

is entered by any Court of competent jurisdiction adjudicating the validity and/or extent of the [Waldteufel claim], whichever is later."

Although the purchase agreement specified a price for the various assets of $2.1 million, the amount Millview was ultimately required to pay depended entirely upon the outcome of the CDO proceeding. In the event a final court order was entered limiting Millview's diversion under the Waldteufel claim to less than 1.64 cubic feet per second, a reduction in purchase price was to be agreed by the parties or determined by binding arbitration.[3] In the event of a more severe limitation on diversion, set at "0.69 [cubic feet per second] during the period of July 1 to November 15," the purchase price "shall be deemed to be the amount of the down payment and the note shall thereupon be cancelled."[4] The purchase agreement required Millview to pursue litigation of the CDO proceeding, but Hill and Gomes were permitted to intervene.

Following an evidentiary hearing on plaintiffs' challenge, the Board issued a CDO in 2011, limiting Millview's diversion under the Waldteufel claim to 15 afa, taken only during the period April through September. Although the Waldteufel claim purported to be a right of appropriation, the Board's order noted the claim did not appear to have been perfected as such because Waldteufel's only demonstrated use of water was for irrigation on the parcel. A finding to this effect would have precluded any appropriation under the claim, but the Board did not base its order on this theory because the original CDO notice did not raise the validity of the Waldteufel claim as an issue. Accepting the Waldteufel claim as appropriative, the Board found plaintiffs had failed to prove Waldteufel had ever

---

[3] A diversion rate of 1.64 cubic feet per second would have resulted in considerably more diversion than permitted by the Board's proposed CDO, which established a maximum diversion rate of 1.1 cubic feet per second and limited the time of year during which diversion could occur.

[4] Because this limitation on diversion would severely reduce the usefulness of the Waldteufel claim, it appears that the nonrefundable $500,000 down payment was intended in part to cover Millview's purchase of the real property and its associated water rights. Because we have no information about this issue and plaintiffs have treated the purchase price as covering only acquisition of the Waldteufel claim, however, we treat the down payment entirely as representing compensation for the claim.

5

perfected the claimed volume of 1,450 afa. At most, the Board concluded, Waldteufel had diverted 243 afa, exclusively during the months of April through October. This amount fixed a maximum level of diversion under the claim. The Board's limitation of diversion to the much lower 15 afa was based on its finding that diversion in excess of 15 afa had been forfeited by the failure of the owners prior to Hill and Gomes to divert a greater volume.

Millview, Gomes, and Hill filed a petition for a writ of mandate requiring the Board to set aside the CDO. The trial court's order granting the writ was affirmed by this court in *Millview I, supra*, 229 Cal.App.4th 879, although on grounds that were not particularly favorable to plaintiffs. We concluded the Board was correct in questioning the appropriative nature of the Waldteufel claim and in finding the maximum perfected diversion to be 243 afa. However, we found the Board had used the wrong legal standard in determining forfeiture, thereby requiring its order to be set aside. We noted three possible options for the Board on remand, besides dismissal of the proceeding: "(1) The Board can set aside the present CDO and enter a new CDO limiting Millview's diversion under the Waldteufel claim to 243 afa, between the months of April and October. . . . ; [¶] (2) The Board can set aside the present CDO and conduct further evidentiary hearings on the issue of forfeiture. . . . ; or [¶] (3) The Board can begin again by issuing an amended notice of draft CDO addressing the issue of the perfection of the Waldteufel claim as a right of appropriation and conduct new administrative hearings directed at this issue, alone or in combination with the issue of forfeiture." (*Millview I*, at p. 908.) If the Board chose to pursue any of those options, there was a risk Millview's diversion of water under the Waldteufel claim would once again be limited to far less than the 1,450 afa originally claimed by plaintiffs.

Following remittitur of our decision, the Board set aside the CDO and, in an order dated August 28, 2015, directed its staff to "consider" initiating an enforcement action against Millview, consistent with the options set out in *Millview I*. The Board has apparently taken no further action with respect to Millview's diversion under the Waldteufel claim.

6

Also following remittitur, plaintiffs renewed a previously filed motion for an award of attorney fees under Code of Civil Procedure section 1021.5. The original motion was filed in 2013, after the trial court issued its order granting the writ of mandate, seeking fees incurred by plaintiffs in connection with the Board and trial court proceedings. The trial court denied it, concluding plaintiffs had not shown a significant public benefit from the litigation. In their renewed motion, plaintiffs added a request for fees incurred in connection with the *Millview I* appeal. The renewed motion argued (1) "[a]lthough [plaintiffs] did not get everything they wanted" from the appeal, they were the prevailing party in the litigation because they obtained a writ vacating the Board's CDO; (2) the litigation enforced an important right affecting the public interest because it concerned appropriative water rights; (3) the litigation conferred a public benefit on a large class of persons by clarifying the law with respect to forfeiture of such rights; and (4) the financial burden of private enforcement justified an award because plaintiffs' attorney fees exceeded their financial benefit.

With respect to the "financial burden" element, plaintiffs argued the litigation would result in no financial benefit to them because they did not receive a monetary award. At most, they argued, the litigation protected "an interest that they previously had." In a declaration explaining Hill's and Gomes's motive for challenging the proposed CDO, Hill conceded, "it was in our financial and other interest to get as much of the water right validated as possible," but he said the pair were also "offended" by the citizen complaint challenging their diversion of the water and "shocked and upset" by the arrogant and mocking attitude of a Board staff member. Millview's general manager also submitted a declaration explaining its motivation for challenging the proposed CDO. Millview was responsible for supplying water to 2,000 "connections," as well as Mendocino Community College. In May 2001, prior to Millview's licensing of the Waldteufel claim, the State Department of Health Services had issued a compliance order that had the effect of placing a moratorium on new connections in the district due to an insufficient water supply. Since entry of the compliance order, Millview had developed a waiting list of 350 applicants for water service. Diversion under the Waldteufel claim, if

7

upheld, would permit Millview to serve these applicants. Although Millview could also obtain water from the Russian River Flood Control and Water Conservation Improvement District (Improvement District), one of the interveners in this litigation, Millview was dissatisfied with the terms offered by the Improvement District. In particular, during an earlier dry period the Improvement District had restricted the water available to Millview, requiring conservation efforts by its customers. If the Waldteufel claim was upheld at the full diversion level claimed by Waldteufel, Millview would not be dependent upon the Improvement District for water.

By the time of the renewed motion, Hill and Gomes had been billed over $339,000 by their attorneys, while Millview's attorney fees totaled $247,028.

Plaintiffs' renewed motion for attorney fees was opposed by the Board, the Improvement District, and the other intervener. They argued (1) the court no longer had jurisdiction to award attorney fees sought in their original attorney fees motion; (2) plaintiffs were not prevailing parties because they had not obtained a judgment affirming their right to divert the full amount of appropriation claimed by the Waldteufel claim; (3) plaintiffs had not conferred a significant public benefit because, at most, they "inadvertently achieved a clarification of the law" of forfeiture; and (4) plaintiffs failed to satisfy the financial burden requirement because they had a significant financial interest in the outcome of the litigation. As to the latter issue, they argued the litigation "implicates who Millview pays for its water and how much it pays, nothing more." They pointed out that Hill and Gomes stood to receive "an immediate economic benefit" from the litigation of $1.6 million, the amount due to them under the purchase agreement if the proposed CDO was vacated and Millview allowed to divert the full amount claimed under the Waldteufel claim. Millview benefitted, they argued, by acquiring a $2.1 million asset that could be used or sold. Further, the water diverted under the Waldteufel claim had a value, potentially "generat[ing] an enormous economic benefit to Millview's rate payers that far exceeds the value Millview paid to Hill and Gomes." Finally, they argued, in the absence of diversion under the Waldteufel claim, Millview would be required to obtain water from another source at some substantial cost.

8

The trial court granted the renewed motion in part, awarding plaintiffs the fees incurred in litigating the *Millview I* appeal, but it denied them fees incurred prior to the appeal, viewing those as no longer available because plaintiffs did not appeal the denial of the original motion. The court concluded plaintiffs were the prevailing parties by virtue of their invalidation of the CDO and had enforced an important right affecting the public interest by obtaining a published appellate opinion addressing forfeiture law. As to the issue of financial burden, the court construed *In re Conservatorship of Whitley* (2010) 50 Cal.4th 1206 (*Whitley*) as holding, "a fee award will ordinarily be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs." Because plaintiffs received no monetary award from the litigation but merely "protected what they already had," the court concluded, an award of fees was appropriate. The court's order directed fees to be paid by the Board only, excusing interveners from liability.

The Board has appealed the trial court's award of the attorney fees incurred in connection with the appeal, while plaintiffs have appealed the court's refusal to award them the fees they incurred earlier in the litigation.

## II.  DISCUSSION

On appeal, the parties largely reiterate the arguments presented to the trial court. We find it necessary to address only the issue of financial burden. Because there is no substantial evidence to support the trial court's conclusion that plaintiffs lacked a sufficient financial incentive to justify their challenge to the CDO, the court's award of private attorney general attorney fees under section 1021.5 constituted an abuse of discretion.

Section 1021.5 was enacted as " 'a codification of the "private attorney general" attorney fee doctrine that had been developed in numerous prior judicial decisions. . . . [T]he fundamental objective of the private attorney general doctrine of attorney fees is " 'to encourage suits effectuating a strong [public] policy by awarding  substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.' " [Citation.] The doctrine rests upon the

9

recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.' " (*Whitley*, *supra*, 50 Cal.4th at pp. 1217–1218, italics omitted.) " '[E]ligibility for section 1021.5 attorney fees is established when "(1) plaintiffs' action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons,' and (3) 'the necessity and financial burden of private enforcement are such as to make the award appropriate.' " ' " (*Summit Media, LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 187, fn. omitted (*Summit Media*).)

Our focus is on the final element, that the "financial burden of private enforcement . . . [is] such as to make the award appropriate."[5] (§ 1021.5) The meaning of "financial burden" was addressed by the Supreme Court in *Whitley*: "In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' " (*Whitley, supra*, 50 Cal.4th at p. 1215.)

In evaluating the element of financial burden, "the inquiry before the trial court [is] whether there were 'insufficient financial incentives to justify the litigation in economic terms.' " (*Summit Media*, *supra*, 240 Cal.App.4th at p. 193.) If the plaintiff had a "personal financial stake" in the litigation "sufficient to warrant [the] decision to

---

[5] The statute also refers to the "necessity" of private enforcement, but the parties do not dispute that private enforcement was necessary here.

10

incur significant attorney fees and costs in the vigorous prosecution" of the lawsuit, an award under section 1021.5 is inappropriate. (*Summit Media*, at pp. 193–194.) " 'Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest.' " (*Davis v. Farmers Insurance Exchange* (2016) 245 Cal.App.4th 1302, 1329, 1330 (*Davis*) [award inappropriate where plaintiff expected "a substantial financial recovery" from the litigation].) " 'Instead, its purpose is to provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate.' " (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 635.) "The relevant issue is ' " 'the estimated value of the case at the time the vital litigation decisions were being made.' " ' " (*Davis*, at p. 1330.)

The burden is on the party requesting section 1021.5 fees to demonstrate all elements of the statute, including that the litigation costs transcend his or her personal interest. (*Norberg v. California Coastal Com.* (2013) 221 Cal.App.4th 535, 545–546 (*Norberg*).) " ' "[Utilizing] its traditional equitable discretion," [the trial] court "must realistically assess the litigation and determine, from a practical perspective" [citation] whether or not the statutory criteria have been met.' [Citation.] [¶] The trial court's judgment on whether a plaintiff has proved each of the prerequisites for an award of attorney fees under section 1021.5 'will not be disturbed unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion.' " (*Summit Media*, *supra*, 240 Cal.App.4th at p. 187.) With respect to the issues of necessity and financial burden, the trial court abuses its discretion in making an award under section 1021.5 when there is no substantial evidence to support the required findings. (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1377.)

Plaintiffs failed to provide substantial evidence to support a finding that " ' "pursuing the lawsuit placed a burden on [them] 'out of proportion to [their] individual stake in the matter.' " ' " (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) As to Hill

11

and Gomes, the financial incentive was unmistakable.  If the proposed CDO was entered by the Board, they would be limited to retaining the down payment under the purchase agreement, forfeiting the portion of the purchase price that was due if no governmental order was entered limiting diversion under the Waldteufel claim—$1,631,500.  Defeating entry of the proposed CDO therefore earned them an additional $1.6 million under the purchase agreement.  Because this potential gain far exceeds the cost to Hill and Gomes of pursuing the litigation, they had more than adequate financial incentive to pursue their challenge.

Millview had a similarly ample financial incentive for challenging issuance of the proposed CDO.  Most obviously, Millview had paid $500,000 for an asset that would be rendered worthless if a CDO was entered severely curtailing diversion under the Waldteufel claim.  Preserving the value of its investment was a substantial incentive. Further, being able to divert water under the Waldteufel claim was plainly valuable to Millview; the district was willing to pay over $2.1 million for the claim.  In making that investment, Millview hoped to gain (1) the ability to serve the waiting list of 350 applicants for water service; (2) independence from the Improvement District as a source of water; (3) a steady supply of water for its customers in dry periods, when its supply might otherwise be reduced; and (4) an ample supply of "free" water, once the purchase costs of the Waldteufel claim were depreciated.[6]  These gains, of course, would only accrue if Millview successfully challenged the CDO.

Plaintiffs' argument that they were merely protecting what they had, even if accepted, does not demonstrate they lacked an adequate financial incentive to participate in the Board proceeding.  Plaintiffs viewed the Waldteufel claim as authorizing diversion of 1,450 afa from the Russian River.  The proposed CDO would have limited diversion

---

[6] While the exact dollar value of these benefits is unclear, it is presumably substantial.  To the extent Millview contended to the contrary, it was Millview's burden to provide the trial court with sufficient information to determine their value.  (*Norberg*, *supra*, 221 Cal.App.4th at pp. 545–546.)  Because Millview failed to supply any information about the financial value of these benefits, it failed in its burden of demonstrating this element of section 1021.5.  (*Norberg*, at pp. 545–546.)

under the claim to slightly more than 1 percent of that volume.  Had plaintiffs taken no action, the Board, in the ordinary course, would have entered the CDO, thereby essentially eliminating diversion under the claim.  From Millview's point of view, the Board's entry of the CDO would have rendered the newly purchased asset, for which it claims to have paid a minimum of $500,000, essentially worthless.  As to Hill and Gomes, entry of the proposed CDO would have reduced their return under the purchase agreement from $2.1 million to $500,000.  For both, the prevention of this result would have provided ample financial incentive to become involved in the lawsuit, even if that involvement is characterized merely as protecting the value of the claim.

Controlling in this regard is *Summit Media*.  In that case, the plaintiff, an operator of billboards in Los Angeles, sued to invalidate a litigation settlement agreement between the City of Los Angeles and several other billboard companies, competitors of the plaintiff.  The agreement exempted the competitors from city regulations limiting their ability to modernize their billboards.  Because the plaintiff was not a party to the settlement, its billboards would have continued to be subject to those regulations. (*Summit Media*, *supra*, 240 Cal.App.4th at pp. 174–175.)  After prevailing, the plaintiff sought an award of attorney fees under section 1021.5, contending it lacked an adequate financial incentive to pursue the litigation because it had sought no damages or other economic recovery.  (*Summit Media*, at pp. 181, 190.)  As the court pointed out, however, the plaintiff had alleged in earlier pleadings that the settlement would place it at a substantial competitive disadvantage, threatening it with substantial economic harm and even the failure of its business.  (*Id.* at pp. 188–189.)  In affirming the trial court's denial of fees, the court rejected the "dubious proposition that the absence of a monetary award necessarily equates to 'zero' financial benefits. . . . [¶] . . . [¶] . . . [T]he absence of a monetary award, or of precise amounts attached to financial incentives, does not prevent a court from determining whether the plaintiff's financial burden in pursuing the lawsuit is ' " 'out of proportion to his individual stake in the matter.' " ' " (*Id.* at pp. 192–193.) Given the potential threat to its profitable business posed by the settlement, the court concluded, "[t]he record supports the trial court's conclusion that plaintiff had a

13

personal financial stake in this litigation that was sufficient to warrant its decision to incur significant attorney fees and costs in the vigorous prosecution of this lawsuit," and thus to support the denial of an award under section 1021.5. (*Summit Media*, at pp. 193–194.) Similarly, in *Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45 (*Fresno*), the court found an award of attorney fees under section 1021.5 inappropriate because the plaintiff, while it recovered nothing from the lawsuit, stood to lose millions of dollars in funding if its lawsuit was unsuccessful. (*Fresno*, at pp. 60–63.) As the court noted, "[t]he benefit to be obtained from this litigation was pecuniary, namely the preservation of money, even if that pecuniary benefit did not come in the form of money damages." (*Id.* at p. 60; see *Young v. State Water Resources Control Bd.* (2013) 219 Cal.App.4th 397, 407 [§ 1021.5 award inappropriate where plaintiffs sought "to benefit financially from securing additional and steady water supplies"].)

In the same way, plaintiffs' failure to seek a monetary award in challenging the CDO did not mean "there were 'insufficient financial incentives to justify the litigation in economic terms.' " (*Summit Media*, *supra*, 240 Cal.App.4th at p. 193.) Had plaintiffs taken no action, the Board's entry of the proposed CDO would have dramatically reduced the value of their assets—for Millview, the Waldteufel claim, and for Hill and Gomes, their return under the purchase agreement. Preventing this reduction in value was ample financial incentive for them to challenge entry of the proposed CDO.

Plaintiffs argue they qualify for a section 1021.5 award under the test enunciated 30 years ago in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*LA Police*), which they characterize as having been "approved" by the Supreme Court in *Whitley*. According to *LA Police*, a court weighing a request for a section 1021.5 award must estimate "the monetary value of the benefits obtained" or the "gains actually attained" by the successful litigant, discount these by the probability of success, and weigh this sum against the costs of the litigation. (*LA Police,* at pp. 9–10.) Once that calculation is performed, "a bounty will be appropriate except where the

14

expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs." (*Id.* at p. 10.)

We disagree with plaintiffs that *Whitley* "approved" the analysis of *LA Police*. The *Whitley* court considered whether a party's "nonfinancial, nonpecuniary personal interests in the litigation" could be considered in determining whether " 'the necessity and financial burden of private enforcement' " made a party ineligible for attorney fees under section 1021.5. (*Whitley, supra*, 50 Cal.4th at p. 1211.) The court concluded "a litigant's personal nonpecuniary motives" are irrelevant to the necessity and financial burden elements, thereby restricting analysis under those provisions to "*financial* incentives and burdens." (*Id.* at pp. 1211, 1217.) Although *Whitley* quoted the *LA Police* test, it did not claim to approve it. Rather, the court characterized it merely as "illustrat[ive]" of a "method for weighing costs and benefits" in evaluating a request for fees under section 1021.5. (*Whitley,* at p. 1215.) Immediately after its quotation from *LA Police*, the *Whitley* court discussed several other cases featuring a "focus on financial incentives and burdens" that did not adopt the approach of *LA Police*. (*Whitley*, at pp. 1015–1016.) In context, the discussion of these cases was intended simply to demonstrate that courts have focused on monetary, as opposed to nonmonetary, benefits in evaluating "financial burden" under section 1021.5. The Supreme Court did not purport to adopt any of them. In any event, because the sole issue addressed in *Whitley* was the relevance in a "financial burden" analysis of the nonfinancial interests of a party, any pronouncement by the court regarding the manner of evaluating financial interests would have constituted dictum. We therefore do not regard ourselves as bound by the method of analysis described in *LA Police* solely because it was quoted by the Supreme Court in *Whitley*.

To the extent the court in *LA Police* intended to suggest that the financial burden analysis is concerned only with the *actual* financial recovery of a party from the litigation, as plaintiffs contend, we decline to follow it. Such a holding is inconsistent with more recent authorities, which, as discussed above, consider a party's financial *incentives* to participate in litigation—that is, the potential financial benefits, broadly

15

defined—regardless of the actual recovery, if any, from the litigation. (*Davis*, *supra*, 245 Cal.App.4th at p. 1330 [relevant issue is the estimated value of the case when litigation decisions made]; *Fresno*, *supra*, 228 Cal.App.4th at p. 62 [the relevant issue is the financial incentives for bringing the lawsuit]; *Norberg*, *supra*, 221 Cal.App.4th at p. 545 [same]; *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 199–200 [§ 1021.5 fees unavailable to successful defendant that was seeking to advance own economic interests].) Indeed, when interpreted in the manner urged by plaintiffs, *LA Police* conflicts with *Whitley* itself, which noted that in determining financial burden "courts have quite logically focused not only on the costs of the litigation but also any *offsetting financial benefits* that the litigation yields or *reasonably could have been expected to yield.*" (*Whitley, supra*, 50 Cal.4th at p. 1215, italics added.) We are not the only court explicitly to decline a literal application of the *LA Police* test. (*Summit Media*, *supra*, 240 Cal.App.4th at p. 192 ["dubious proposition" that *LA Police* analysis should be applied in every case]; *Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 406 [declining to apply *LA Police* test].) We adhere to the analysis of financial incentives discussed above, notwithstanding any contrary analysis that might be derived from the language of *LA Police*.

Because we conclude plaintiffs failed to provide the trial court with substantial evidence to support a finding the costs of the litigation transcended their personal financial stakes, a finding necessary to support any award of attorney fees under section 1021.5, it is unnecessary for us to consider whether any of the other statutory elements were satisfied. Even if other requirements of section 1021.5 were met, plaintiffs would not be entitled to an award. Similarly, we need not address plaintiffs' cross-appeal. Even if, as they contend, the trial court had jurisdiction to award fees incurred earlier in the litigation, our ruling on the element of financial burden precludes the recovery of the earlier fees as well.

### III. DISPOSITION

The portion of the trial court's order granting to plaintiffs attorney fees expended in connection with *Millview I* is reversed, while the portion of its order denying an award

of fees incurred by plaintiffs earlier in the litigation is affirmed.  The Board may recover its costs associated with both its own appeal and plaintiffs' cross-appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.

Filed 10/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILLVIEW COUNTY WATER DISTRICT et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE WATER RESOURCES CONTROL BOARD, <br><br> Defendant and Appellant. | A145428 <br><br> (Mendocino County <br> Super. Ct. No. SCUKCVPT1259715) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION <br><br> NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on September 28, 2016, be modified as follows:

On page 11, the second complete sentence on the page is amended to read:

Defeating entry of the proposed CDO had the potential to earn them as much as an additional $1.6 million under the purchase agreement.

There is no change in the judgment.

Appellant Millview County Water District's request for leave to file an untimely petition for rehearing is granted, but the petition for rehearing is denied.

1

The referenced opinion was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated:

_____

Margulies, Acting P.J.

2

Trial Court:   Mendocino County Superior Court

Trial Judge:   Hon. Leslie C. Nichols (Retired Judge of the Santa Clara Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Counsel:

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Gavin G. McCabe and William Jenkins, Deputy Attorneys General for Defendant and Appellant State Water Resources Control Board.

Neary and O'Brien, Christopher J. Neary and Jennifer O'Brien for Plaintiffs and Appellants Millview County Water District.

Carter, Momsen & Knight, Jared G. Carter, Matisse M. Knight and Alexander C. Rich for Plaintiffs and Appellants Steven L. Gomes and Thomas P. Hill.