Filed 3/12/21  Boppana v. City of Los Angeles CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| RAO BOPPANA et al., | B304823 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS159371) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent, | |
| ROBERT NOLAN, Real Party in Interest and Respondent. | |

APPEAL from a post-judgment order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Craig A. Sherman, for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Senior Assistant City Attorney, and Gabriel S. Dermer, Assistant City Attorney, for Defendant and Respondent City of Los Angeles.

Ervin Cohen & Jessup, Elizabeth M. Thompson and Kimberly D. Lewis, for Real Party in Interest and Respondent.

———————————————

## INTRODUCTION

Rao and Rita Boppana and Robert Nolan are neighbors. They have been litigating with each other in a civil action for years. When the Boppanas learned Nolan had obtained a construction permit for improvements on and around his property, they filed this mandamus action to compel the City of Los Angeles to revoke the permit. The Boppanas ultimately prevailed in their mandamus action, and the City revoked Nolan's permit. (See *Boppana v. City of Los Angeles* (Mar. 19, 2019, B283454) [nonpub. opn.] (*Boppana I*).)

The Boppanas filed a motion for attorneys' fees under Code of Civil Procedure section 1021.5,[1] arguing they acted as private attorneys general and enforced "an important public issue affecting and benefitting the citizens and residents of the entire city of Los Angeles." The superior court denied the motion, and the Boppanas appealed. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Boppanas and Nolan Build Walls and Fences, Then Sue Each Other*

The Boppanas and Nolan live next to each other in Playa del Rey, a residential neighborhood in Los Angeles. A 10-foot-wide public right-of-way, known as Veragua Walk, lies between

———————————

[1]   Undesignated statutory references are to the Code of Civil Procedure.

2

the two properties. At some point after purchasing their property in 1997, the Boppanas built a wall that, according to Nolan, "encroach[ed] on Nolan's portion of Veragua Walk."

In 2014 Nolan sued the Boppanas to quiet title to what he claimed was his portion of Veragua Walk. Nolan sought a judgment requiring the Boppanas to remove the portion of their wall Nolan claimed was on his half of Veragua Walk, enjoining the Boppanas from surveilling Nolan and his family, and prohibiting the Boppanas from planting trees on Veragua Walk that, over time, would block Nolan's "incredible view."

The Boppanas filed a cross-complaint against Nolan, alleging he illegally built fences, walls, gates, and other structures along Veragua Walk and the front yard of his property. The Boppanas claimed Nolan's front yard structures extended "'beyond [Nolan's] property line'" into the street (a public right-of-way) adjoining his property. (*Boppana I*, *supra*, B283454.) The Boppanas alleged that Nolan constructed and maintained "illegal structures . . . for which he has no legal right to use or possess" and that Nolan's front yard structures "protrude into the public street and right of way in a location and height not permitted as a matter of law."[2] The Boppanas asserted causes of action for private and public nuisance, negligence, and negligence per se, as well as for trespass, based on the allegation Nolan cut and poisoned the Boppanas' bamboo, and invasion of privacy, based on the allegation Nolan filmed and

---

[2] The Boppanas also alleged Nolan built illegal "block walls" along the western side of his property, constructed a "recreation building with a roof-top observation deck," and increased the elevation of the side and rear yards "in association with his building of walls and structures."

conducted surveillance of the Boppanas. The Boppanas sought compensatory and punitive damages.

B. *The City Issues Nolan a Revocable Permit, and the Boppanas Obtain a Writ of Mandate Compelling the City To Revoke It*

Through discovery in their civil action with Nolan, the Boppanas learned in 2015 that Nolan had applied for, and the City (through the Bureau of Engineering) had issued, a revocable permit (known as an R-Permit) under Los Angeles Municipal Code section 62.118.2 for the fence, gate, and wall Nolan built along his front yard and the public right-of-way. (*Boppana I*, *supra*, B283454.) Rao Boppana "was extremely surprised to hear that [the] City could and would grant development permits for structures and developments that [were] not allowed or authorized under city codes, development ordinances, and [their] properties' adopted specific plan."

On December 1, 2015 the Boppanas filed a petition for writ of mandate (this action) to compel the City to revoke Nolan's permit, arguing the City, in reviewing Nolan's permit application, did not comply with applicable provisions of the Los Angeles Building Code, the Comprehensive Zoning Plan of the City of Los Angeles, and the Coastal Bluffs Specific Plan. Nolan and the City argued that these provisions did not apply to structures built in a public right-of-way and that the City did not have to determine whether Nolan's application and proposed structures complied with those laws. (*Boppana I*, *supra*, B283454.)

Shortly after filing their petition for writ of mandate, the Boppanas filed a notice of related case stating that the civil action and the mandamus action involved the same parties, were based on the same or similar claims, and arose "from the

4

same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact." The Boppanas also filed, and the trial court in the civil action granted, an ex parte application to stay the civil action "pending resolution" of the mandamus action. The Boppanas argued in their ex parte application: "Adjudication of the issues in the writ . . . proceeding could resolve and/or cause one or more legal and factual issues in this case to be moot."

In 2017 the superior court denied the Boppanas' petition for writ of mandate, and the Boppanas appealed. On March 19, 2019 we reversed the judgment and held the superior court should have granted the Boppanas' petition. We concluded Los Angeles Municipal Code section 62.118.2 required the City to review a permit application "for compliance with City land use laws," to submit the application "for review by other city agencies," and to direct the applicant "to obtain any other necessary approvals or permits from other agencies." Because the City failed to "consider the applicability of the Building Code, the Zoning Code, and the Specific Plan" before issuing Nolan an R-Permit for his front yard structures, we directed the superior court to issue a writ of mandate "compelling the [City] to revoke the permit." (*Boppana I*, *supra*, B283454.)

On June 25, 2019 the Boppanas filed a status conference report in the civil action, asking the trial court to vacate the stay (which had been in effect for three and a half years) and to set the matter for trial. Referring to the mandamus action and our opinion in *Boppana I*, the Boppanas asserted: "This related case involves Boppana's now successfully challenge[d] and overturned decision of the City of Los Angeles' . . . improper granting of a development and use permit (via a Revocable Permit) that purportedly allowed . . . Nolan to construct and

5

maintain the subject front and side yard developments that are not allowed or permitted under the City's controlling zoning codes or the adopted Coastal Bluffs Specific Plan. [¶] Boppana contends that the illegality and unpermitted construction and nature of Nolan's developments, that have caused the subject nuisance and damages to Boppana, have been substantially admitted and substantially proven such that this matter can now be tried and adjudicated to determine damages and remedies."

C.   *The Boppanas File a Motion for Attorneys' Fees Under Section 1021.5*

On November 19, 2019 the Boppanas filed a motion under section 1021.5 seeking to recover the attorneys' fees they incurred in the mandamus action. Rao Boppana stated that he incurred $88,500 in attorneys' fees, which he said was calculated based on his attorney's discounted hourly rate. Counsel for the Boppanas stated he agreed to reduce his hourly rate based on the "strengths" of the Boppanas' claims and the "public-interest nature" of the case. The Boppanas contended that the mandamus lawsuit enforced "an important right affecting the public interest," that a "significant benefit has been conferred on the general public or a large class of persons," and that "the necessity and financial burden of private enforcement make an award of fees appropriate."

The superior court in the mandamus action issued a tentative ruling denying the Boppanas' motion for attorneys' fees, concluding that the Boppanas had "not identified an important right affecting the public interest," that they did not confer a significant benefit on a large class of persons, and that their financial benefit "far exceed[ed] the $88,500 in attorneys' fees that [they] incurred in this lawsuit." At the hearing on the

6

motion, counsel for the Boppanas argued the engineer who approved Nolan's R-Permit testified he issued "thousands" of R-Permits without considering the zoning laws and general plans of the area. The court stated that, "in every lawsuit against the City where the petitioner wins," the "City [is] being compelled to follow the law," but that "there has got to be more than that to get attorneys' fees." Counsel for the City argued that "this victory is really a neighbor dispute" and that there was "no evidence before the court" of how many R-Permits the City would issue in the future.

Turning to the Boppanas' financial burden, counsel for the Boppanas initially argued the court's tentative ruling erroneously looked at the "potential prospective outcome" of the civil action. But after further argument, counsel conceded the court could "look to what [the Boppanas are] asking for in the [civil] case." Counsel for the Boppanas emphasized, however, that the court should "deduct . . . other claims that are unrelated to this litigation" and calculate that deduction based on "the likelihood of prevailing on those claims." Counsel for Nolan argued that the case law focused on the parties' "incentives" and "what they reasonably believed might occur if they prevailed and how that guided their decision-making process."

The court found that the Boppanas subjectively believed they would prevail in their cross-complaint against Nolan and that this court's ruling in *Boppana I* helped the Boppanas because they could argue in the civil action that issue preclusion applied to any issues relating to "the R-Permit's legality." The court stated that the two cases "are really linked." When counsel for the Boppanas responded that the cases were only related "by a small aspect," the court asked counsel to "put a number on it." When counsel for the

7

Boppanas responded, "$100,000," the court stated, "Even then, $100,000, but you only spent $88,500 here." The court denied the Boppanas' motion and adopted its tentative decision as the ruling of the court. The Boppanas timely appealed.

**DISCUSSION**

A.   *Applicable Law and Standard of Review*

Section 1021.5 is an exception to the general rule that "'parties in litigation pay their own attorney's fees.'" (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1107; see *La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, 1155.) It provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[3] (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 & fn. 2 (*Whitley*); *Sandlin v. McLaughlin* (2020) 50 Cal.App.5th 805, 827-828.)

---

[3]   "The third factor [section 1021.5, subdivision (c),] 'does not apply where, as here, a plaintiff's action produces no monetary recovery.'" (*Carlsbad Police Officers Assn. v. City of Carlsbad* (2020) 49 Cal.App.5th 135, 145.)

"'[T]he Legislature adopted section 1021.5 as a codification of the "private attorney general" attorney fee doctrine that had been developed in numerous prior judicial decisions. . . . [T]he fundamental objective of the private attorney general doctrine of attorney fees is "'to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.'" [Citation.] The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will *as a practical matter frequently be infeasible*.'" (*Whitley*, *supra*, 50 Cal.4th at pp. 1217-1218; accord, *Department of Fair Employment & Housing v. Cathy's Creations, Inc.* (2020) 54 Cal.App.5th 404, 411-412; see *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 611-612 ["'section 1021.5 acts as an incentive for the pursuit of public interest-related litigation that might otherwise have been too costly to bring'"].)

"[E]ligibility for section 1021.5 attorney fees is established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate."'" (*Whitley*, *supra*, 50 Cal.4th at p. 1214; accord, *Sandlin v. McLaughlin*, *supra*, 50 Cal.App.5th at p. 828.) Because "'section 1021.5 states the criteria in the conjunctive, each of

the statutory criteria must be met to justify a fee award.'" (*People v. Investco Mgmt. & Dev. LLC* (2018) 22 Cal.App.5th 443, 456 (*Investco*); see *Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759, 769 (*Millview*) ["The burden is on the party requesting section 1021.5 fees to demonstrate all elements of the statute, including that the litigation costs transcend his or her personal interest."]; *Summit Media LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 187, 193-194 (*Summit Media*) [affirming an order denying attorneys' fees under section 1021.5 because, although the plaintiff satisfied two of the prerequisites in section 1021.5, the plaintiff did not prove the third].) "Accordingly, we may uphold the trial court's order denying the attorney fees motion if we determine any one of these elements is missing." (*Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45, 55 (*Children & Families*).)

We review a ruling on a motion for attorneys' fees under section 1021.5 for abuse of discretion. (*Whitley*, *supra*, 50 Cal.4th at p. 1213.) "Our review of the trial court's denial of private attorney general fees is deferential." (*Lafferty v. Wells Fargo Bank, N.A.* (2018) 25 Cal.App.5th 398, 420.) "'The trial court's judgment on whether a plaintiff has proved each of the prerequisites for an award of attorney fees under section 1021.5 "will not be disturbed unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion."'" (*Millview*, *supra*, 4 Cal.App.5th at p. 769.)

B.   *The Trial Court Did Not Abuse Its Discretion in Denying the Boppanas' Motion for Attorneys' Fees Under Section 1021.5*

The Boppanas argue the superior court erred in ruling they failed to meet their burden on all three requirements for

10

an award of attorneys' fees under section 1021.5: enforcing an important right, conferring a significant benefit on a large class of persons, and necessarily incurring a financial burden that makes an award appropriate. We question (but need not resolve) whether the Boppanas enforced an important right affecting the public interest and whether their mandamus action conferred a significant benefit on a large class of persons. Both this action and the civil action are, at root, part of a long-simmering private dispute between litigious neighbors over walls, fences, encroachments, and views. But because the Boppanas failed to meet the third requirement of section 1021.5, showing that the financial burden of private enforcement made the award appropriate, we can conclude the superior court did not abuse its discretion in ruling the Boppanas were not entitled to fees under section 1021.5.

1.    *Applicable Law*

"[T]he necessity and financial burden requirement "'really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.'" [Citation.] The 'necessity' of private enforcement "'"looks to the adequacy of public enforcement and seeks economic equalization of representation in cases where private enforcement is necessary.'" [Citations.]'" [Citation.] . . . [¶] The second prong of the inquiry addresses the 'financial burden of private enforcement.' In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. "'An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory

11

transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]'" [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.'" (*Whitley*, *supra*, 50 Cal.4th at pp. 1214-1215; accord *Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 991-992 (*Sweetwater*).)

"[I]n assessing the financial burdens and benefits . . . we are evaluating incentives rather than outcomes. '"[W]e do not look at the plaintiff's *actual* recovery after trial, but instead we consider 'the estimated value of the case at the time the vital litigation decisions were being made.'"'" (*Whitley*, *supra*, 50 Cal.4th at p. 1220; see *Children & Families*, *supra*, 228 Cal.App.4th at p. 62.) "A party seeking fees under section 1021.5 has the burden of establishing its litigation costs transcend its personal interests." (*Children & Families*, at p. 55.)

2.     *The Boppanas' Financial Burden Did Not Transcend Their Personal Interests*

The City and Nolan do not argue the Boppanas' enforcement of Los Angeles Municipal Code section 62.118.2 was not necessary. The City, which was responsible for reviewing applications for permits to build on a public right-of-way, did not review Nolan's permit application in compliance with Los Angeles Municipal Code section 62.118.2. Therefore, the Boppanas had to enforce that provision of the municipal code in the mandamus action. (See *Whitley*, *supra*, 50 Cal.4th at p. 1215 ['"[i]nasmuch as the present action proceeded against the only governmental agencies that bear responsibility for the subdivision approval process, the necessity of private, as

12

compared to public, enforcement becomes clear'"]; *Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1366-1367 [same].) But the City and Nolan do dispute that the Boppanas' financial burden outweighed their financial stake in the case. For their part, the Boppanas argue the superior court "misapplied the relevant and binding case law and erred in estimating [their] financial gain" from their successful mandamus action.

In explaining how to determine the financial burden the litigation placed on the party seeking attorneys' fees under section 1021.5, the Supreme Court in *Whitley*, *supra*, 50 Cal.4th at page 1215, cited with approval the "method for weighing costs and benefits" described in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 9-10. The Supreme Court held: "'The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves. . . . Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome. . . . [¶] "After approximating the estimated value of the case . . . , the court must then turn to the costs of the litigation . . . , which may have been required to bring the case to fruition. . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.'"" (*Whitley*, at pp. 1215-1216; accord, *City of Oakland v. Oakland Police & Fire Retirement System* (2018) 29 Cal.App.5th 688, 699-700 (*City of Oakland*).) "[T]he absence of a monetary award, or of precise amounts attached to financial incentives, does not prevent a court from determining whether

the plaintiff's financial burden in pursuing the lawsuit is "'"out of proportion to his individual stake in the matter."'"'" (*Summit Media*, *supra*, 240 Cal.App.4th at p. 193.)

The superior court did not abuse its discretion in ruling the Boppanas failed to show the financial burden of litigating the mandamus action "placed a burden on them 'out of proportion to [their] individual stake in the matter.'" Following the method for estimating costs and benefits approved in *Whitley*, *supra*, 50 Cal.4th at page 1215, the superior court started by considering the Boppanas' cross-complaint against Nolan in the civil action. In that cross-complaint, the Boppanas alleged that the "illegal" and "unpermitted" structures, which included those Nolan built to enclose his front yard, caused them $400,000 in damages. The superior court fixed the Boppanas' expected financial recovery at a minimum of $400,000, and based on the discount factor proposed by counsel for the Boppanas at the hearing, reduced the $400,000 recovery by 75 percent to $100,000. After comparing the adjusted amount of expected compensatory damages to the $88,500 in attorneys' fees the Boppanas incurred, the court concluded the costs of the mandamus litigation did not transcend the Boppanas' financial incentive. In assessing the Boppanas' financial incentive to challenge Nolan's R-Permit, the superior court reasonably determined the Boppanas' victory in this case, which established the R-Permit's "illegality," would "aid them in obtaining compensatory and punitive damages" in the civil action.

The Boppanas alleged in their cross-complaint that Nolan's construction was illegal or unpermitted.[4]  Establishing that fact would inevitably help the Boppanas prove their nuisance and negligence causes of action in the civil action against Nolan.  (See Evid. Code, § 669, subd. (a) ["[t]he failure of a person to exercise due care is presumed" if he or she "violated a statute, ordinance, or regulation of a public entity"]; *Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 939-940 ["a private person who suffers identifiable harm by reason of a violation of a municipal zoning law may sue the violator for compensatory damages"]; *Vollaro v. Lispi* (2014) 224 Cal.App.4th 93, 102, fn. 7 ["'"proof of [a party's] violation of a statutory standard of conduct raises a presumption of negligence"'"]; *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 255 ["[v]iolations of a planning code constitute a public nuisance"].)

But when Nolan produced evidence in discovery in the civil action that he had obtained a permit for the front yard structures, the Boppanas' nuisance and negligence causes of

---

[4]      In their nuisance cause of action, the Boppanas alleged that "Nolan knew of the legal requirements to obtain building permits and/or variances to construct . . . one or more of the walls, fences, gates, and structures" and that he "proceeded without authority or permits, without review and approval of building plans and inspections, irrespective [of] laws . . . put in place to protect the rights of the Boppanas."  In their negligence cause of action, the Boppanas alleged that "Nolan owes a duty to the Boppanas to not construct or maintain illegal, unauthorized, defective structures and land uses" and that the "structures created . . . by Nolan have not been used and/or maintained within a standard of care . . . nor has plans or permits been applied, reviewed and approved."

15

action became more difficult to prove.  Nolan's newly disclosed permit "surprised" Rao Boppana, who had always believed the structures were illegal and unpermitted.  It became imperative for the Boppanas to seek revocation of the permit, which they ultimately achieved in the mandamus action.  As the Boppanas argued in support of their petition for a writ of mandate:  "By the R-Permit, Nolan has obtained an end-around process . . . whereby he obtained approval for structures . . . that are known by Nolan and City to be illegal.  [¶] . . . [¶]  Despite knowledge of his illegality, . . . Nolan has sought to obtain use and legitimacy of his illegal structures via the R-Permit."

Thus, the Boppanas had a significant private financial reason for filing the petition for writ of mandate—to compel the City to revoke the R-Permit and (re)establish the illegality of Nolan's construction.[5]  And once the Boppanas accomplished this goal, they promptly asked the trial court to vacate the stay of the civil action and argued that their victory in the mandamus action "substantially" proved Nolan's construction was illegal, created a nuisance, and caused the Boppanas' damages.  The Boppanas told the trial court that the mandamus action had essentially proven their case on liability and that the only remaining issues to be "tried and adjudicated" in the civil action were the amount of their damages and their entitlement to other remedies.  As the superior court commented, in finding

---

[5]     The Boppanas were well aware that proving Nolan's front yard construction was illegal would support their nuisance cause of action.  In a brief filed in support of their petition for writ of mandate, the Boppanas argued, "It is well settled that violations of municipal/ building/planning and/or zoning codes are a public nuisance."

the Boppanas expected the mandamus action to aid their civil action, "What more do I need?"

The Boppanas' other court filings provided further support for the superior court's conclusion that the civil action and the mandamus action were "intertwined." The Boppanas attempted to relate the civil action and the mandamus action. When that effort failed because the superior court in the mandamus action could not preside over civil actions (which are assigned to the independent calendar courts), the Boppanas filed an ex parte application to stay the civil action "pending resolution" of the mandamus action. The Boppanas argued the mandamus action could resolve or moot some of the issues in the civil action. The superior court did not abuse its discretion in concluding that the Boppanas expected the mandamus action to assist their civil action and that the Boppanas stood to gain much more than the $88,500 in attorneys' fees they expended.

In *Norberg v. California Coastal Com.* (2013) 221 Cal.App.4th 535 the court reached a similar conclusion on similar facts. In that case the plaintiff obtained a writ of mandate directing the California Coastal Commission to set aside certain restrictions it had imposed on a permit for residential improvements. The court in *Norberg* reversed an award of attorneys' fees under section 1021.5 because, even though the plaintiff did not obtain a monetary award and did not intend to sell his property in the foreseeable future, "the financial burden of the litigation was not out of proportion to [his] individual stake in the matter." (*Norberg,* at p. 539.) The court concluded that the plaintiff's "goal was to enhance his private property with $250,000 in improvements. We call this a financial incentive. We cannot slice it any other way." (*Id.* at p. 545; see *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 109, 114 [plaintiff was not entitled to fees

17

under section 1021.5 where its "financial stake in the outcome of its litigation was substantial" and where the writ of mandate that ordered the agency to strike one of the conditions in a construction permit allowed the plaintiff to build the development at greatly reduced cost]; *Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547, 551-552, 559 [plaintiff was not entitled to fees under section 1021.5 where the plaintiff, who obtained an order compelling the city to conduct an environmental review, "initiated the suit to prevent the threat of damage or depreciation to his property"].)

Like the plaintiff in *Norberg v. California Coastal Com.* (and the plaintiffs in similar cases), the Boppanas' incentive for seeking a writ of mandate was almost exclusively financial: Revocation of Nolan's R-Permit would create an easier path to proving one of the key facts they needed to prove in their nuisance and negligence causes of action; namely, that Nolan built his front yard structures illegally. As the Boppanas asserted (at the time they filed their petition): "It can hardly be said that [the] Boppana[s] [are] not beneficially interested and aggrieved by a neighbor obtaining a development and use permit that has structures and other features zoning and other land use rules do not allow. . . . [The] Boppana[s] [are] not . . . public activist[s] from Pasadena complaining about a permit or land use decision in Playa del Rey." No, they are not. (See *Weiss v. City of Los Angeles* (2016) 2 Cal.App.5th 194, 218 ["In enacting section 1021.5, 'the Legislature was focused on public interest litigation in the conventional sense: litigation designed to promote the public interest by enforcing laws that a governmental or private entity was violating, rather than private litigation that happened to establish an important precedent.'"].)

18

Although the Boppanas conceded at the hearing on the motion for attorneys' fees that the superior court could consider their expected recovery in the civil action, the Boppanas now contend the superior court should not have considered those financial incentives. Emphasizing the words "litigation" and "lawsuit" from a passage in *Whitley*, *supra*, 50 Cal.4th at page 1215, the Boppanas argue the superior court should have focused only on "the financial incentives of the *instant lawsuit*." That's not how it works. The Supreme Court in *Whitley* did not hold that section 1021.5 limits the court's consideration of a litigant's benefits to those obtained in the lawsuit. To the contrary, as the Supreme Court discussed in *Whitley* (in the same passage cited by the Boppanas), in evaluating the financial burden under section 1021.5, the court should consider, in addition to the costs of the litigation, any actual or reasonably expected yields from the litigation. (*Whitley*, at p. 1215; see *Summit Media*, *supra*, 240 Cal.App.4th at p. 192 ["*Whitley* [does not] say that a plaintiff's financial incentive must be 'direct'"].) The Boppanas expected to prevail in the mandamus action and anticipated that a victory there would help them prevail in their civil action against Nolan. (See *Summit Media*, at pp. 188-189, 193-194 [plaintiff had an "enormous" financial incentive to seek a writ of mandate to compel the city to set aside a settlement agreement that exempted the plaintiff's competitors from certain restrictions that applied to others in the industry, where the plaintiff claimed the agreement put him at a "competitive disadvantage" that would "'injure [his] business goodwill'" and where, although the mandamus action did not yield a financial recovery, the plaintiff had "a personal financial stake in [the] litigation that was sufficient to warrant its decision to incur significant attorney fees and costs"]; see also *Millview*, *supra*,

19

4 Cal.App.5th at p. 770 [plaintiff had a financial incentive to challenge a cease and desist order that would have restricted its purchased right to divert water].)  The Boppanas had ample financial incentive to pursue the mandamus action and try to compel the City to revoke Nolan's R-Permit.

The Boppanas assert, for the first time on appeal and without citing any authority, that even if the superior court properly considered the value of the civil action, the court should have applied a discount factor of 83.33 percent to their $400,000 in compensatory damages, to account for the fact "5 out of 6 of the subjects in the nuisance, trespass, and privacy invasion claims. . . have no connection whatsoever to the front-yard structures."  Because the Boppanas did not make this argument in the superior court, it is forfeited.  (See *Sweetwater*, *supra*, 36 Cal.App.5th at p. 993 ["'arguments not asserted below are waived and will not be considered for the first time on appeal'"].)

It also lacks merit.  That the Boppanas alleged other causes of action or identified other illegally constructed structures in their cross-complaint in the civil action did not mean they valued each cause of action against Nolan, and each allegation of wrongdoing, equally.  For example, Rao Boppana stated he was seeking damages in the civil action not only for "diminution in the value of the real property" related to the "[n]uisance from Nolan's unpermitted constructions," but also for "[l]oss of . . . abutter's rights from Nolan's front yard construction."  He described the nuisance created by Nolan's front yard structures as follows:  "I expect when I drive out of my driveway . . . the house on either side would have the same requirements in terms of fence heights. . . .  [W]e have a difficult time backing out than if . . . Nolan's wall and the trees are not there. . . .  [¶]  It's the sight lines. . . .  [¶] . . .  [I]t's get[ting] worse for us on a daily

basis." In fact, the superior court probably underestimated the compensatory damages that the Boppanas anticipated recovering for Nolan's unpermitted front yard encroachments, which they claimed presented "safety issues" and caused them "fear."[6] Moreover, even applying the Boppanas' belatedly asserted discount factor of 83.33 percent to the total amount the Boppanas were seeking in the civil action ($400,000 in compensatory damages and $1 million in punitive damages), the net proceeds from the civil action would be approximately $233,000, which still exceeds the $88,500 in attorneys' fees they incurred in the mandamus action.

The cases the Boppanas cite are distinguishable. In *Investco, supra*, 22 Cal.App.5th 443 investors who intervened in a security fraud action "did not avoid any loss of money or value to their assets or investments by specially appearing in the . . . action, and there were no benefits that 'immediately and directly translated into' economic terms for [the intervenors] as a result of their success" because they simply secured "the right to sue." (*Id.* at pp. 468, 470.) In *Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376 the plaintiffs obtained a writ compelling the city to prepare an environmental impact report before approving a project, but the report would not necessarily cause the city to set aside its approval, and the plaintiffs filed the action in part because of the project's impact on "wildlife, aesthetics, health and noise levels." (*Id.* at pp. 381,

---

[6] In referring to the danger posed by the visual obstruction created by the vegetation growing in Nolan's front yard, counsel for the Boppanas commented: "Fortunately, they haven't been in a car accident and died, so we don't have a million-dollar claim."

390, 393.)  In *Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290 the "estimated value of the case [was] lower than the $558,052.50 in attorney fees," any "financial benefit [the plaintiff] might receive [was] 'at least once removed from the results of the litigation,'" and the plaintiff's "financial benefit was speculative." (*Id.* at p. 310.)  And in *City of Oakland*, *supra*, 29 Cal.App.5th 688, an "unusual" case brought by retirees who could not afford litigation expenses because of their "relative poverty" and who did not stand to gain any "new money" but were only trying "to avoid significant repayments of pension benefits they likely had already allocated," the court held an award of fees was appropriate "'in the interest of justice.'" (*Id.* at pp. 702-703, 708-709.)  In contrast to the plaintiffs in these cases, the Boppanas, who own property on a coastal bluff and do not claim poverty, obtained a significant economic benefit for themselves in the mandamus action in the form of facts and findings they could use in their private litigation with their neighbor.

## DISPOSITION

The superior court's order denying the Boppanas' motion for attorneys' fees is affirmed. The City and Nolan are to recover their costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

McCORMICK, J.*

---

\*      Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.